## STATE OF CONNECTICUT *v.* TANIA THOMAS
### (AC 27797)

Gruendel, Beach and Pellegrino, Js.

Argued May 19—officially released October 7, 2008

*Darcy McGraw*, special public defender, for the appellant (defendant).

*Christopher T. Godialis*, assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Christian M. Watson*, assistant state's attorney, for the appellee (state).

*Opinion*

BEACH, J. The defendant, Tania Thomas, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (2) and assault in the third degree in violation of General Statutes § 53a-61 (a) (1).[1] On appeal, the defendant claims that the trial court improperly precluded her from presenting relevant evidence and cross-examining witnesses. She further claims that the state engaged in prosecutorial impropriety in its questioning of two witnesses and that the evidence was insufficient to sustain her conviction of assault in the third degree. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In the early evening of November 4, 2005, Jessica Wilson parked her white Nissan Maxima on the curb of Woodard Drive in Bristol, in front of the house of Jonathan Ortiz, the brother of her boyfriend, Moussay Ortiz. The defendant, who also was involved romantically with Moussay Ortiz, was already at the residence on Woodard Drive. Shortly after Wilson's arrival at the Woodard Drive house, Wilson and the defendant engaged in a physical altercation. After both Wilson and the defendant had left Woodard Drive in separate vehicles, they engaged in another altercation in front of a children's museum in Bristol. The defendant sustained some scratches to her face and body and a laceration to her leg during the altercations, and Wilson sustained

[1] The jury also returned a guilty verdict on one count of assault in the second degree in violation of General Statutes § 53a-60 (a) (1). At sentencing, that count was merged with the defendant's conviction of assault in the first degree.

serious injuries to her face and scalp that required extensive medical treatment. Following the incidents, police obtained voluntary written statements from both Wilson and the defendant.

On February 14, 2006, the state filed an amended information charging the defendant with assault in the first, second and third degrees. A trial to the jury was held over three days at which Wilson, Jonathan Ortiz, Moussay Ortiz and the defendant testified about the physical altercation that occurred between Wilson and the defendant. Two treating nurses and a plastic surgeon also testified regarding the injuries Wilson had sustained in the fight. Much of the testimony adduced at trial as to the details of the altercations was disputed. Nevertheless, both women admitted at trial that they had fought numerous times over the course of the several months preceding November 4, 2005, and both admitted that they had been arrested for that activity.

Regarding the altercation on Woodard Drive, Wilson testified that she went to Jonathan Ortiz' house to speak with him about repairing her car and that only after she parked her vehicle did she see that the defendant was at the house. She further testified that shortly after she parked her vehicle, the defendant "came and she swung at me," and engaged her in a fight. The defendant, on the other hand, testified that after Wilson had arrived at the house, Wilson screamed obscenities at her, spat at her and instigated the physical altercation. Jonathan Ortiz testified that he saw Wilson drive past the house once, while the defendant was outside engaged with him in conversation, before returning and parking in front of the curb. He further testified that Wilson exited her car and began arguing with the defendant. Specifically, he testified that "she ran over to [the defendant] and spat on her and began hitting her [and that she] ran up to her and attacked her." Following the fight,

Jonathan Ortiz testified, Wilson and the defendant "were both covered in blood."

As to the altercation near the children's museum, Wilson testified that after she left Woodard Drive, she was traveling to a friend's house and that along the way she picked up Moussay Ortiz, who sat in the passenger seat. The defendant testified that she was in the area of the children's museum to use a local automated teller machine when she saw Wilson and Moussay Ortiz in Wilson's vehicle. On the street just beyond the entrance to the museum, the defendant stopped her vehicle alongside the curb, and immediately thereafter, Wilson stopped her car next to that of the defendant. The defendant then got out of her car and leaned into the passenger side window of Wilson's vehicle. A bystander who was near the entrance to the museum testified that she could hear yelling and that she saw arms flailing. The bystander then testified that "[w]e saw the white car start to take off. The girl that was hanging out of the white car got pinned between her door and the white car. . . . And so the white car sped off with the girl hanging out of it and then turned the corner . . . ."

Wilson testified that after the defendant came through the passenger side window, the defendant fought with Moussay Ortiz and pulled Wilson's hair. The defendant testified that she did not fight with Wilson in the car but rather attempted to retrieve her house keys from Moussay Ortiz. Shortly following the confrontation, the defendant was transported to a hospital in an ambulance. Wilson testified that she drove to a friend's house and that her friend had another person drive her to the hospital.

Once at the hospital, Wilson was treated for several injuries, the most serious of which was a partial amputation of her nose caused by a human bite. A nurse who treated Wilson testified that "[s]he came in with facial

trauma from an assault. . . . She was missing—a large piece of her nose was avulsed.[2] It was completely off. She had facial lacerations, scalp lacerations and a laceration behind her ear." Wilson's plastic surgeon also testified at trial that Wilson had undergone surgery to reconstruct the right side of her nose and that she would require further surgery to complete the reconstruction.

On February 17, 2006, the jury returned a verdict of guilty on all counts charged. The defendant was sentenced on April 18, 2006, to a total effective term of ten years incarceration, suspended after two years, and five years probation. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court violated her constitutional right to present a defense when it precluded her from presenting evidence that Wilson had a motive to act as the aggressor. The defendant maintains that the exclusion of this evidence was harmful because it was material to her claim of self-defense. We agree that the exclusion of the evidence was improper but conclude that the error was harmless.

The following additional facts are relevant to our discussion of the defendant's claim. During its case-in-chief, the state called Wilson to testify. The state then elicited testimony from Wilson that she had lied in her statement to police about where the altercations had occurred. In her statement, Wilson maintained that the fight had occurred in front of the children's museum; she made no mention of the incidents occurring at Woodard Drive. On both direct and cross-examination, Wilson explained that she had lied to avoid arrest.

[2] An avulsion is defined as "[a] tearing away or forcible separation." Stedman's Medical Dictionary (27th Ed. 2000) p. 175.

Thereafter, defense counsel inquired in cross-examination of Wilson if she had any children. Wilson responded that she has one child who is six years old. Later in the cross-examination, defense counsel asked her if she had custody of a child named Evelyn. The state objected on the ground that the question was beyond the scope of direct examination, and the court agreed. Defense counsel then asked Wilson if she had "ever heard of Isabelle Wilson." Wilson responded that "[t]here is no Isabelle Wilson." The state again objected, and the court sustained its objection.

Immediately following the objection and outside of the presence of the jury, defense counsel argued that the line of inquiry was relevant to Wilson's credibility. He asserted that Wilson had lied under oath about how many children she had and that the defense had information to believe that one of Wilson's children may have been sold for drug money. The state objected to the inquiry on the ground of relevance, and the court sustained the state's objection.

On the third day of trial, after the state had rested its case, defense counsel asked the court to recall Wilson as a witness. At that point, outside of the presence of the jury, the state requested a proffer as to "why he is recalling her when he could have asked her these questions on cross-examination." The state further argued that any line of inquiry as to Wilson's alleged "other child" should be excluded as irrelevant. Defense counsel maintained that the evidence was relevant to Wilson's motive to instigate the altercations. Specifically, he stated: "I plan to present evidence that [Wilson's] motive for . . . lying to the police about what had occurred . . . on Woodard Drive is to silence my client because my client had spoken with [Wilson] with regard to this illegitimate child that she is denying. This whole motive is to quiet and to get revenge because my client has physical evidence of a child that [Wilson]

had given birth to that may or may not be [Moussay Ortiz'] child. That's the entire crux of this whole altercation. [It] [h]as to do with an illegitimate child that my client was trying to expose, and that's the motive . . . for [Wilson's] making up the testimony to try to get her behind bars for . . . revenge and to . . . silence her. It goes directly to . . . this [charge of] assault [in the first degree] and [Wilson's] fabrication, which she admitted on the [witness] stand." In response to the state's claim that the line of inquiry was not relevant to the issue of self-defense, defense counsel asserted that "my defense is that [Wilson] attacked [the defendant] because of this information. This is the crux of the case here. This information is damaging . . . if it comes to light, [it] is absolutely mind-blowing. We have . . . evidence of a child that she denied on the [witness] stand, which we believe is [Moussay Ortiz'] child, and which was the subject of numerous conversations between [the defendant] and [Wilson] and [Moussay Ortiz], and which is at the heart of this issue." The defendant then made her offer of proof, which included a social security card for Isabelle Nora Wilson and a department of public health parent notice for Isabelle Nora Wilson. Defense counsel added that the defendant "had evidence of a baby . . . that she has information and belief was sold on the black market for money to a person who—we believe we have that person's name as well."

The court responded to the defendant's arguments by noting that "motive is something that the jury will be instructed on. However, I do not frankly see the relevance of a love child, and I think the jury, when they get to their deliberations, will be instructed as to what to put the weight toward. And I don't think, in light of the concerns I have about the rights of victims [that I will] allow a side show as to a love child." Following a brief recess, the court sustained the state's objection "basically, on the basis of relevancy . . . ." The

court stated no other reason on which it based its decision.

We begin our analysis by setting forth the legal principles that govern our review. "As we recently observed, [a] defendant's right to present a defense does not include a right to present evidence that properly is excluded under the rules of evidence. . . . The sixth amendment to the United States constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The defendant's sixth amendment right, however, does not require the trial court to forgo completely restraints on the admissibility of evidence. . . . Generally, [a defendant] must comply with established rules of procedure and evidence in exercising his right to present a defense. . . . A defendant, therefore, may introduce only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right is not violated. . . .

"The standard of review we apply to a trial court's evidentiary rulings is well settled. Such rulings are entitled to great deference. . . . The trial court is given broad latitude in ruling on the admissibility of evidence, and we will not disturb such a ruling unless it is shown that the ruling amounted to an abuse of discretion. . . . Even when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful. . . . In our review, we make every reasonable presumption in favor of upholding the trial court's ruling. . . .

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable

or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . The determination of whether a matter is relevant to a material issue rests within the sound discretion of the trial court." (Internal quotation marks omitted.) *State* v. *Abreu*, 106 Conn. App. 278, 282–83, 941 A.2d 974, cert. denied, 286 Conn. 919, 946 A.2d 1249 (2008); see also *State* v. *Cerreta*, 260 Conn. 251, 260–61, 796 A.2d 1176 (2002).

We conclude that the court improperly excluded evidence relevant to Wilson's alleged motive to attack the defendant. Because the defendant raised the defense of self-defense at trial, the determination of whether Wilson or the defendant was the initial aggressor was material. See General Statutes § 53a-19. Although the proffered evidence may have strained credulity, it tended to corroborate the defendant's assertion that Wilson initially attacked her because it tended to show that Wilson had a motive to attack the defendant to prevent her from relaying information about Wilson's child to Moussay Ortiz. "To be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree." (Internal quotation marks omitted.) *State* v. *Miller*, 95 Conn. App. 362, 387–88, 896 A.2d 844, cert. denied, 279 Conn. 907, 901 A.2d 1228 (2006). The odd nature of the offer does not detract from its ability to support the conclusion for which it was offered. Accordingly, we conclude that the evidence was relevant and that its exclusion constituted an abuse of the court's discretion.

Having reached that conclusion, we turn now to the question of whether the court's improper exclusion of the evidence entitles the defendant to a new trial. The

defendant claims that the impropriety is of a constitutional dimension, as it deprived her of her right to present a defense under the sixth and fourteenth amendments to the federal constitution. We disagree and conclude that the exclusion of the evidence in question did not deprive the defendant of her opportunity to present a complete defense. As noted, the defendant's theory regarding Wilson's alleged second child, if admitted, would have supported the defendant's claim that Wilson was motivated to attack her. Any evidence tending to show that the defendant was not the initial aggressor would lend support to the defendant's self-defense claim. Nevertheless, evidence was introduced at trial regarding Wilson's motive to attack the defendant. For example, evidence was adduced that the two women were bitter rivals, that they had fought for the attentions of Moussay Ortiz and that they had been arrested several times for fighting with each other. Wilson acknowledged in her testimony that she previously had fought with the defendant and called her "a black bitch." Because the theory in question provided at most merely one more motivation to attack, its exclusion did not foreclose an entire defense theory and, therefore, did not rise to the level of a constitutional violation.

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Outlaw*, 108 Conn. App. 772, 785, 949 A.2d 544, cert. denied, 289 Conn. 915, 957 A.2d 880 (2008). As our Supreme Court recently has noted, "a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . [O]ur determination that the defendant was harmed by the trial court's [evidentiary rulings] is guided by the various factors that we have articulated as relevant [to] the inquiry of evidentiary harmlessness . . . such as the importance of the [evidence] in the prosecution's case,

whether the [evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [evidence] on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) *State* v. *Jacobson*, 283 Conn. 618, 641–42, 930 A.2d 628 (2007).

Here, the defendant has failed to persuade us that the exclusion of the evidence substantially affected the verdict. In fact, the only statement in the defendant's brief arguably relating to harmfulness is that "[t]he jury obviously was entitled to information so crucial to its evaluation of the witness' credibility." Wilson's credibility, however, already had been called into question when she admitted that she had lied in her statement about what had happened. Even apart from questions of credibility, we reiterate that the defendant was able to introduce evidence at trial regarding a motive on the part of Wilson to attack her. Any further evidence in that regard most likely would not have made a difference in the verdict. Accordingly, we conclude that the exclusion of evidence as to Wilson's alleged second child was harmless and that the defendant is not entitled to a new trial.

II

The defendant next claims that the court improperly precluded her from cross-examining Wilson about Wilson's use of crack cocaine. We disagree.[3]

[3] Interwoven with the defendant's argument regarding the cross-examination of Wilson is the defendant's argument that the court improperly restricted defense counsel's direct examination of her witness, Moussay Ortiz, regarding Wilson's drug use. The record reveals that Moussay Ortiz did testify as to Wilson's drug use on the day before the altercations but that the court sustained an objection as to how many times he had seen Wilson ingest illegal drugs on the ground of relevance. "[T]he trial court's ruling on the relevancy of . . . evidence will be reversed on appeal only if the court has abused its discretion or an injustice appears to have been

During the defendant's cross-examination of Wilson, the following colloquy occurred:

"[Defense Counsel]: You are a little shaky today. Are you under the influence of anything today?

"[The Witness]: No.

"[Defense Counsel]: Are you under the influence of any alcohol or drugs that will affect your ability?

"[The Witness]: No.

"[Defense Counsel]: Have you smoked anything, or—

"[The Prosecutor]: This is absurd at this point to be quite honest with you.

"The Court: Yeah, I sustain it."

At that point, defense counsel requested a further hearing on the matter, and the jury was excused. Thereafter, defense counsel argued that "[u]pon information and belief, [Wilson] is constantly under the influence of crack cocaine." He further argued that her alleged addiction was relevant to her state of mind and her ability to perceive. The court initially observed that defense counsel had ambushed the witness with "rapid fire" questions. It then concluded that defense counsel "can ask and she can answer . . . but if it's 'no,' she denies it, then you would have to use other witnesses to, basically, attack her credibility." Upon further objection from the state, the court also restricted the form of

done." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 107 Conn. App. 685, 710, 946 A.2d 294, cert. denied, 288 Conn. 904, 953 A.2d 650 (2008).

We agree with the court that the only relevant time periods regarding Wilson's alleged intoxication are at the time of the altercations and at the time of trial. See id., 710–11 ("We agree with the court that whether [the witness] used drugs when he was in high school was not relevant to whether [the witness] purchased drugs . . . on the night in question. When asked, [the witness] denied using drugs. It was for the jury to decide if [the witness] was telling the truth. We conclude that the court did not abuse its discretion or deny the defendant a constitutional right.").

the defendant's questions regarding Wilson's alleged addiction to "yes or no" questions. When defense counsel resumed his cross-examination of Wilson, he did not inquire about Wilson's drug use. Later, during his direct examination of Wilson, defense counsel inquired briefly whether she was under the influence of drugs on the day of the altercations or the day before. Wilson responded "no" to both questions.

"Our standard of review of a claim that the court improperly limited the cross-examination of a witness is one of abuse of discretion. . . . [I]n . . . matters pertaining to control over cross-examination, a considerable latitude of discretion is allowed. . . . The determination of whether a matter is relevant or collateral, and the scope and extent of cross-examination of a witness, generally rests within the sound discretion of the trial court. . . . Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . .

"The court's discretion, however, comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment [to the United States constitution]. . . . The sixth amendment . . . guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . . As an appropriate and potentially vital function of cross-examination, exposure of a witness' motive, interest, bias or prejudice may not be unduly restricted. . . . Compliance with the constitutionally guaranteed right to cross-examination requires that the defendant be allowed to present the jury with facts from which it could appropriately draw inferences relating to the witness' reliability. . . . [P]reclusion of sufficient inquiry into a particular matter tending to show motive, bias

and interest may result in a violation of the constitutional requirements of the sixth amendment. . . . In determining whether such a violation occurred, [w]e consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) *State* v. *Holbrook*, 97 Conn. App. 490, 497–98, 906 A.2d 4, cert. denied, 280 Conn. 935, 909 A.2d 962 (2006).

We conclude that the defendant's cross-examination of Wilson was not unduly restricted. Although the court limited the manner in which defense counsel could inquire about Wilson's drug use, it did not prohibit such an inquiry. In all, during his entire examination of Wilson, defense counsel was able to inquire whether she was under the influence of drugs both at the time of the incident and at trial. Wilson responded negatively to all questions posed on the subject. Furthermore, following argument before the court, the defendant did not avail herself of the opportunity to pursue the topic on cross-examination. We fail to see how the defendant effectively could have pursued the subject in any event, given Wilson's negative responses to all questions posed. Additionally, even if the court abused its discretion, any impropriety was harmless, as the defendant was able to introduce rebuttal testimony through Moussay Ortiz that Wilson had smoked crack cocaine on the night before the altercations. The court did not abuse its discretion, and, therefore, the defendant's claim fails.

III

The defendant next claims that the prosecutor committed impropriety in the questioning of two witnesses. Specifically, the defendant maintains that the prosecutor improperly made himself a witness by referring to

pretrial conversations he had had with Wilson and Jonathan Ortiz while he was examining them at trial.[4] We are not persuaded.

"In analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. . . . Only if we conclude that prosecutorial [impropriety] has occurred do we then determine whether the defendant was deprived of his due process right to a fair trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Gordon*, 104 Conn. App. 69, 73–74, 931 A.2d 939, cert. denied, 284 Conn. 937, 937 A.2d 695 (2007).

Although the defendant asserts that the "prosecutor injected himself as a witness by asking questions about conversations they had with him during interviews in the prosecutor's office," we can discern no impropriety in the examinations cited by the defendant. The defendant refers to the prosecutor's rehabilitation of Wilson and his questioning of Jonathan Ortiz concerning a prior inconsistent statement as improper.[5] We have reviewed

---

[4] Although the defendant's claim of prosecutorial impropriety was not preserved at trial, it may be reviewed utilizing the two-pronged analysis that we have applied in the past. See *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004) (unpreserved claims of prosecutorial impropriety reviewable without seeking review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 [1989]).

[5] A portion of the examination of Wilson, as cited by the defendant, is as follows:

"[The Prosecutor]: When you met with me the first time and I spoke with you, what did you say?

"[The Witness]: I told you the same story.

"[The Prosecutor]: That's in your statement.

"[The Witness]: Yes.

"[The Prosecutor]: And the same story meaning where the incident occurred?

"[The Witness]: Yes.

"[The Prosecutor]: Okay. And you told me it occurred in the car.

"[The Witness]: Yes.

the examinations in question and see no improper expression of opinion as to the witnesses' credibility, or appeals to the emotions or prejudices of the jury. See *State* v. *Salamon*, 287 Conn. 509, 564, 949 A.2d 1092 (2008) (prosecutor may not seek to sway jury by unfair appeals to emotion and prejudice or express opinion, directly or indirectly as to credibility of witnesses). Contrary to the defendant's assertions, the testimony in question as to Wilson appears to be a straightforward example of witness rehabilitation. As to Jonathan Ortiz, it is not apparent that the testimony revealed any prior inconsistent statement. See footnote 5. Furthermore, the defendant has not cited any case in which this court

"[The Prosecutor]: Okay. And when you met with me the second time, what did you do, Ms. Wilson?

"[The Witness]: I came and told you the truth.

"[The Prosecutor]: Why did you do that, Ms. Wilson?

"[The Witness]: Because you had made a comment the first time I had spoke with you about any little thing—me not telling the truth could get [the defendant] off of what she did to me, and so I felt that I needed to come clean and tell you the truth. Because I didn't want her to get off on some little lie."

A portion of the examination of Jonathan Ortiz, as cited by the defendant, is as follows:

"[The Prosecutor]: Do you remember when you came and you spoke with me in my office?

"[The Witness]: Yes.

"[The Prosecutor]: What did you tell me—or do you remember telling me about this fight, meaning sometimes you win, sometimes you lose? Do you remember saying that?

"[The Witness]: Yeah. . . . Yes.

"[The Prosecutor]: What did you mean by that?

"[The Witness]: I mean, when someone fights—I mean, I am a street fighter. You've got to carry two bags, one to take and one to give out. Sometimes you win. Sometimes you lose. That's what I told him.

"[The Prosecutor]: Do you remember telling me in my office that . . . Wilson lost this fight?

"[The Witness]: I said, yes, that I thought [Wilson] had lost the fight because she left.

"[The Prosecutor]: Didn't you just testify on direct examination that you thought it was an even match?

"[The Witness]: Yeah, it was an even fight, but then she left. . . . From the experience that I have as a street fighter, he who walks away loses."

or our Supreme Court has determined that a prosecutor's mere reference to a prior conversation with that witness during the course of examining that witness, without more, renders the prosecutor an unsworn witness in the case. Because we conclude that the prosecutor's questioning of Wilson and Jonathan Ortiz was not improper, we reject the defendant's claim.[6]

## IV

The defendant finally claims that the evidence was insufficient to support the conviction as to the charge of assault in the third degree stemming from her conduct near the children's museum in Bristol. We disagree.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *John B.*, 102 Conn. App. 453, 469, 925 A.2d 1235, cert. denied, 284 Conn. 906, 931 A.2d 267 (2007). A person is guilty of assault in the third degree in violation of § 53a-61 (a) (1) when "[w]ith intent to cause physical injury to another person, he causes such injury to such person . . . ." General Statutes § 53a-61 (a) (1),

The defendant argues that the evidence was insufficient to demonstrate that she assaulted Wilson near the children's museum. In support of her argument, the defendant asserts that the only testimony adduced at trial supporting her conviction of assault in the third degree was from Wilson. The defendant maintains that

---

[6] Our rejection of the defendant's claim, on the grounds raised in this court, and in the absence of objection in the trial court, is not to be construed as an endorsement of the questioning.

because Wilson admitted to lying in her statement to police about the fact that an altercation had occurred at Woodard Drive, her testimony about what had occurred in her car by the children's museum necessarily must be false. The defendant's claim, although clothed in sufficiency of the evidence language, in reality challenges the credibility of Wilson's testimony.

"Our task is to view the evidence in the light most favorable to sustaining the verdict before determining if the jury reasonably could have concluded that such evidence established guilt beyond a reasonable doubt. . . . We assume that the jury credited the evidence that supports the conviction if it could reasonably have done so. Questions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . Our review of factual determinations is limited to whether those findings are clearly erroneous. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Citation omitted; internal quotation marks omitted.) *State* v. *Osoria*, 86 Conn. App. 507, 514–15, 861 A.2d 1207 (2004), cert. denied, 273 Conn. 910, 870 A.2d 1082 (2005). Wilson testified both on direct and cross-examination that during the incident by the children's museum, the defendant leaned into the passenger window of her vehicle and pulled her hair. The state also entered into evidence a clump of bloodied hair found in Wilson's vehicle, as well as a photograph depicting the clump of hair on the floor of the vehicle. On the record before us, the jury was free to credit Wilson's testimony. Because we cannot decide issues of credibility, the defendant's claim must fail.

The judgment is affirmed.

In this opinion the other judges concurred.